United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IMMIGRANT LEGAL RESOURCE CENTER, et al.,

Plaintiffs,

v.

CHAD F. WOLF, et al.,

Defendants.

Case No. 20-cv-05883-JSW

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR STAY OF EFFECTIVE DATE OF RULE AND DENYING REQUEST FOR ADMINISTRATIVE STAY**

Re: Dkt. No. 27

Now before the Court for consideration is the motion for a preliminary injunction filed by Plaintiffs[1], eight non-profit organizations that provide a variety of "services benefitting low-income applicants for immigration benefits." Compl. ¶¶ 7, 14-21; *see generally* Dkt. Nos. 27-4 through 24-7, 27-10, and 27-12 through 27-14: Declarations of Lawrence Benito (ICIRR), Olga Byrne (IRC), Michael Byun (ACRS), Jeff Chenoweth (CLINIC), Michael Smith (EBSC), Melissa Rodgers (ILRC), Angelica Salas (CHIRLA), and Rich Stolz (One America); *see also* Docket No. 95 (describing populations served and types of services provided).

Defendants are Chad Wolf ("Mr. Wolf"), in his capacity as Acting Secretary of the United States Department of Homeland Security ("DHS"), DHS, Kenneth T. Cuccinelli ("Mr. Cuccinelli"), in his capacity as Senior Official Performing the Duties of Deputy Secretary of Homeland Security, and USCIS.[2]

---

[1]    Immigrant Legal Resource Center ("ILRC"), East Bay Sanctuary Covenant ("EBSC"), Coalition for Human Immigrant Rights ("CHIRLA"), Catholic Legal Immigration Network, Inc. ("CLINIC"), International Rescue Committee ("IRC"), OneAmerica, Asian Counseling and Referral Service ("ACRS"), and the Illinois Coalition for Immigrant and Refugee Rights ("ICIRR").

[2]    Plaintiffs contend that neither Mr. Wolf nor Mr. Cuccinelli are lawfully serving in those

1

Plaintiffs move to enjoin implementation of the USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788 (Aug. 3, 2020) ("Final Rule") and to stay its effective date of October 2, 2020.[3]  *See* Dkt. No. 74-1, Reply Declaration of Brian Stretch ("Stretch Reply Decl."), ¶ 2, Ex. 35 (Final Rule).  The Court has considered the parties' papers, including all supplemental submissions, relevant legal authority, the record in this case, and the parties' arguments at the hearing held on September 25, 2020.[4]  For the reasons that follow, the Court GRANTS Plaintiffs' motion.  The Court also determines that a brief administrative stay of this ruling pending any decision by Defendants to appeal this Order is not warranted.  However, if Defendants do file an appeal, nothing in this Order shall preclude them from filing a motion to stay before this Court.

**BACKGROUND**

USCIS is funded primarily by the fees it collects, rather by Congressional appropriations, and its budget is separate from the budgets for the agencies that provide DHS's enforcement services, Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP").  *See* 6 U.S.C. § 296; 8 U.S.C. §§ 1356(h), (m); *see also* Compl. ¶¶ 47-49, 56.  Fees collected by USCIS are deposited in the Immigration Examinations Fee Account ("IEFA") to

---

offices.

[3]   There are at least two additional cases that challenge all or portions of the Final Rule on the same or similar grounds raised by Plaintiffs here.  *See Northwest Immigrant Rights Project, et al., v. U.S. Customs & Immigration Servs.*, *et al.,* D.D.C No. 19-cv-3283-RDM; *Project Citizenship, Inc. v. U.S. Dep't of Homeland Sec., et al.*, D. Ma. No. 20-cv-11545-NMG.  The court in *Northwest Immigrants* held a hearing on the plaintiffs' motion for a preliminary injunction on September 24, 2020.  The court in *Project Citizenship* is scheduled to hear the plaintiff's motion for a preliminary injunction on October 23, 2020.

[4]   The Court also considered eight amicus briefs.  The Constitutional Accountability Center ("CAC") (Dkt. No. 38-1) and The Cato Institute ("Cato") (Dkt. No. 39) provided additional argument in support Plaintiffs on the issues addressed in Section B of this Order.  The remaining briefs filed in support of Plaintiffs' motion are from: (1) the Alliance of Business Immigration Lawyers (Dkt. No. 36); (2) a group of ten non-profit immigration advocates and legal and social service providers, including Kids in Need of Defense and the National Immigration Justice Center (Dkt. No. 47-1); (3) a group of twenty-one local governments and elected officials, including the County of Santa Clara and the City of New York (Dkt. No. 54); (4) a group of nineteen states, including California (Dkt. No. 55); and (5) Reclaim the Records (Dkt. No. 65-1).  The Immigration Reform Law Institute filed an amicus brief in support of Defendants.  (Dkt. No. 51.)

United States District Court
Northern District of California

United States District Court
Northern District of California

provide "adjudication and naturalization services." 8 U.S.C. § 1356(m). Those fees

> may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.

*Id.*

USCIS conducts biennial fee reviews and, during the review for Fiscal Years ("FY") 2019/2020, "determined that current fees do not recover the full cost of providing adjudication and naturalization services." Final Rule, 85 Fed. Reg. at 46,788; *see also id.* at 46,789 (stating "[f]ee schedule adjustments are necessary to recover the full operating costs associated with administering the nation's lawful immigration system and safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefit[s], while protecting Americans, securing the homeland, and honoring our values"); *see also* Stretch Reply Decl., ¶ 5, Ex. 38 (2019-2020 IEFA Fee Review Supporting Documentation with Addendum, May 2020 ("May IEFA Fee Review")).

On November 14, 2019, following that biennial fee review, DHS issued a notice of proposed rule-making signed by Kevin K. McAleenan ("Mr. McAleenan") as "Acting Secretary". Stretch Reply. Decl., ¶ 3, Ex. 36 (USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280, at 62,280 and 62,371 (Nov. 14, 2019) ("NPRM")). DHS stated that the current fee levels "are insufficient to recover the full cost of [USCIS's] operations funded by the IEFA" and stated that if USCIS "continues to operate at current fee levels, it would experience an average annual shortfall (the amount by which expenses exceed revenue) of $1,262.3 million." *Id.* at 62,282. DHS required written comments to be submitted before December 16, 2019, although DHS extended the comment period twice. The comment period eventually closed on February 10, 2020. *See* Stretch Reply Decl., ¶ 4, Ex. 4 (84 Fed. Reg. 67,243 (Dec. 19, 2019)); *see also* 85 Fed. Reg. 4,243 (Jan. 24, 2020). DHS published the Final Rule on August 3, 2020.

DHS initially proposed to adjust fees by a weighted average increase of 21 percent. NPRM, 84 Fed. Reg. at 46,280. In the Final Rule DHS adjusts "USCIS fees by a weighted

average increase of 20 percent, add[s] new fees for certain immigration benefit requests, establish[es] multiple fees for non-immigrant worker petitions, and limit[s] the number of beneficiaries for certain forms." Final Rule, 85 Fed. Reg. at 46,788. The Final Rule also makes changes to fee waivers by eliminating the ability to seek a waiver for some fees and by changing the criteria used to determine if an individual is eligible for a waiver. *Id.* at 46,789.

While Plaintiffs challenge the validity of the Final Rule in its entirety, they highlight that DHS will require a $50.00 non-waivable fee to apply for asylum. *See id.* at 46,844. The Immigration and Nationality Act ("INA") permits USCIS to impose a fee "for the consideration of an application for asylum [and] for employment authorization" so long as the fees do not "exceed the Attorney General's costs in adjudicating the applications." 8 U.S.C. § 1158(d). Until this rule was proposed, the United States did not charge a fee to apply for asylum.[5] Instead, the cost of applying for asylum has been subsidized by "other fee-paying benefit requestors[.]" NPRM, 84 Fed. Reg. at 62,318. In addition to the application fees, immigrants seeking asylum also will be required to pay a $550.00 for their first Employment Authorization Document ("EAD"), as well as a $30.00 biometric fee. None of these three fees can be waived. The Final Rule does provide for "a $50 reduction in the fee for Form I-485, Application to Register Permanent Residence or Adjust Status, filed in the future, for principal applicants who pay the $50 fee for Form I-589 and are subsequently granted asylum." Final Rule, 85 Fed. Reg. at 46,790.

On the same day DHS issued this NRPM, it also initiated a proposed rule-making procedure regarding Asylum Application, Interview, and Employment Authorization for Applicants. *See* 85 Fed. Reg. 38,532 (June 26, 2020). Under prior rules, applicants for asylum had to wait 180 days before they could work in the United States, but DHS extended that waiting period to 365 days. *See* 85 Fed. Reg. at 38,626 (to be codified at 8 C.F.R. § 208.7(a)(1)(ii)) ("An applicant for asylum cannot apply for initial employment authorization earlier than 365 calendar

---

[5] This decision makes the United States one of four countries that impose fees to apply for this type of relief. According to the record, Iran, Fiji, and Australia also charge fees for asylum or refugee protection but provide for waivers or exemptions in some instances. *See* Final Rule, 85 Fed. Reg. at 46,848; NPRM, 84 Fed. Reg. at 62,319.

4

days after the date USCIS or the immigration court receives the asylum application[.]"), enjoined, in part, by *Casa de Maryland, Inc. v. Wolf,* No. 8:20-cv-02118-PX, -- F. Supp. 3d --, 2020 WL 5500165, at \*2 n.3 (D. Md. Sept. 11, 2020) ("*Casa de Maryland*") (noting that "[i]n the last year," DHS has pursued rulemakings that "would make it more difficult to secure asylum" and citing, *inter alia*, NPRM, 84 Fed. Reg. 62,280).

Plaintiffs also highlight the fact that DHS increased the application fee for naturalization from \$640 to \$1,170, increased other fees associated with naturalization, and eliminated the option to obtain fee waivers for those fees. Final Rule, 85 Fed. Reg. at 46,791-792, Table 1 (noting fee increases for Forms N-300, N-36, N-400, N-470). DHS did reduce the fee associated with renewing lawful permanent resident ("LPR") status, but it "unbundled" fees for three applications associated with obtaining LPR status: the application for permanent residency (Form I-485), the application for an EAD (Form I-765), and an application for travel document (Form I-131.) *Id.*, at 46,791-792 & Table 1. Plaintiffs allege that, since 2007, there has been flat fee of \$1,140 for those applications (\$750 for children under 14). DHS will now charge \$1,130 for Form I-485, \$550 for Form I-765, and \$590 for Form I-131. *Id.*

Plaintiffs also highlight the changes to fee waivers in the Final Rule. "The 2011 Fee Waiver Policy" provided that an applicant could qualify for a fee waiver if: (1) they received a means-tested benefit; (2) had household incomes at or below 150% of the Federal Poverty Guidelines ("FPG"); or (3) could establish extreme financial hardship. *See* NPRM, 84 Fed. Reg. at 62,298. The NPRM noted that the proposed rule would "further limit[] forms eligible for a fee waiver and the criteria to establish eligibility for a fee waiver. *Id.* Under the Final Rule, where fee waivers are still available, an applicant will be eligible only if their annual household income is less than 125% of the FPG.[6] Final Rule, 85 Fed. Reg. at 46,819-820.

Plaintiffs' motion addresses their first, second, and third claims for relief, which allege

---

[6] Under the William Wilburforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), DHS is required to provide the opportunity for certain applicants to apply for fee waivers for "any fees associated with filing an application for relief through final adjudication of the adjustment of status." 8 U.S.C. § 1255(*l*)(7); *see also* NPRM, 84 Fed. Reg. at 62,297, Table 7; Final Rule, 85 Fed. Reg. at 46,812-813, Table 3.

United States District Court
Northern District of California

violations of the Administrative Procedure Act, 5 U.S.C. section 706.  The Court will address additional facts as necessary in the analysis.

# ANALYSIS

## A. Legal Standards Applicable to a Motion for a Preliminary Injunction.

In order to prevail on their motion, "Plaintiffs must show that (1) they are likely to succeed on the merits, (2) they are likely to 'suffer irreparable harm' without relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844-45 (9th Cir. 2020) ("*Barr*"); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Where, as here, "the government is a party these last two factors merge." *Barr*, 964 F.3d at 845 (quoting *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  In *Alliance for the Wild Rockies v. Cottrell*, the Ninth Circuit held that the "serious questions" sliding scale approach survives *Winter*.  632 F.3d 1127, 1134-35 (9th Cir. 2011).  Thus, a court may grant a preliminary injunction if a plaintiff demonstrates that there are serious questions going to the merits and a hardship balance that tips sharply in its favor, and the other two elements of the *Winter* test are also met.  *Id.* at 1132.

Under the APA, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, …, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.  "The factors considered when issuing such a stay substantially overlap with the *Winter* factors for a preliminary injunction." *City and County of San Francisco v. U.S. Customs & Immigration Servs.*, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019).

## B. Plaintiffs' Challenges to the Validity of Mr. McAleenan's and Mr. Wolf's Service as Acting Secretary of DHS.

The APA permits a court to, *inter alia,* "hold unlawful and set aside agency action, findings and conclusions found to be - arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Plaintiffs assert the Final Rule must be set aside as contrary to law because neither Mr. McAleenan nor Mr. Wolf were lawfully serving as

Acting Secretary when the NRPM and Final Rule were issued.  Plaintiffs argue the appointments: (1) were not effective under the relevant provisions of the Homeland Security Act ("HSA"); and (2) violated the time limitations on service contained in the Federal Vacancies Reform Act ("FVRA").

Under the Appointments Clause, the President is granted the power to nominate Officers of the United States, such as DHS Secretary.  U.S. Const., art. II, § 2, cl.2.  That power is counterbalanced by "[t]he Senate's advice and consent power … a critical structural safeguard of the constitutional scheme." *NLRB v. Sw. General, Inc.*, -- U.S. --, 137 S.Ct. 929, 935 (2017) ("*Sw. General II*") (internal quotations, alterations and citations omitted).  The Senate's power to advise and consent was designed to place a "'check upon a spirit of favoritism in the President,' 'prevent the appointment of unfit characters,' and provide a 'source of stability in the administration.'" *Bullock v. U.S. Bureau of Land Mgmt.*, No. 20-cv-000620-BMM, -- F. Supp. 3d --, 2020 WL 5746836, at *7 (D. Mont. Sept. 25, 2020) (quoting The Federalist No. 76 (A. Hamilton)).

On April 7, 2019, former DHS Secretary Kirstjen M. Nielsen announced her resignation and left office on April 10, 2019.  President Trump did not submit a nominee to replace Secretary Nielsen until September 10, 2020, when he nominated Mr. Wolf for that position.  As that delay demonstrates, "[t]he constitutional process of Presidential appointment and Senate confirmation [PAS] can take time." *Sw. General II*, 137 S.Ct. at 935.  To account for such delays, Congress enacted vacancy statutes through which it gives "the President limited authority to appoint acting officials to temporarily perform the functions of a PAS office without first obtaining Senate approval." *Id.*; *see also Casa De Maryland*, 2020 WL 5500165, at *14.  Those vacancy statutes "allowed the President to fill vacancies with temporary acting officers, subject to limitations on whom he could appoint and how long the appointee could serve." *Sw. General, Inc. v. NLRB*, 796 F.3d 67, 81 (D.C. Cir. 2015) ("*Sw. General I*").  The Executive Branch did not always comply with those limitations, resulting in "interbranch conflict" and, eventually, the passage of the FVRA in 1998.  *See Sw. General II*, 137 S.Ct. at 935-36.[7]

---

[7]    The Court will not detail the history of the various vacancy statutes or the conflicts that ultimately led to the passage of the FVRA, which are detailed in *Southwest General II*, 137 S.Ct.

United States District Court
Northern District of California

7

Section 3345 of the FVRA addresses who may fill a vacancy in a PAS office. 5 U.S.C. § 3345(a). Section 3345(a) sets forth a "default" rule, which provides that the "first assistant" to the vacant office "shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." Alternatively, "the President (and only the President) may direct" an individual to serve temporarily in an acting capacity "subject to the time limitations of section 3346[.]" 5 U.S.C. § 3345(a)(2)-(3). Section 3345 of the FVRA also addresses who is not eligible to serve as an acting officer. By way of example, "a person may not service as an acting officer for an office under this section if -- during the 365-day period preceding the" vacancy "such person … did not serve in the position of first assistant to the office of such officer … and the President submits a nomination of such person to the Senate to such office." 5 U.S.C. §§ 3345(b)(1)(A)(i), (B); *see also Sw. General II*, 137 S.Ct. at 938. The Supreme Court has held the prohibition contained in Section 3345(b)(1) applies to each subsection of 3345(a). *Sw. General II*, 137 S.Ct. at 935.

Subject to an exception not relevant here, "the person serving as an acting officer as described under section 3345 may serve in the office – (1) for no longer than 210 days beginning on the date the vacancy occurs; or (2) … once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. §§ 3346(a)(1)-(2). The FVRA also establishes certain penalties for non-compliance with its terms. "An action taken by any person who is not acting under section 3345, 3346, or 3347, or as provided by [section 3348] subsection (b), in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply *shall have no force and effect*." 5 U.S.C. § 3348(d)(1) (emphasis added). Such an action also "may not be ratified." *Id.* § 3348(d)(2).

"Congress enacted the FVRA against the backdrop of several agency-specific succession statutes applicable to PAS offices," and it added an "exclusivity" provision, Section 3347, to accommodate those statutes. *Casa de Maryland*, 2020 WL 5500165, at *15. Section 3347

at 935-36, *Casa de Maryland*, 2020 WL 5500165, at *14-15, and the amicus brief submitted by CAC at pp. 3-6.

United States District Court
Northern District of California

provides, in relevant part:

> Sections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of [a PAS office] *unless* – … a statutory provision expressly – … authorizes the … head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or … designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity[.]

5 U.S.C. § 3347(a)(1)(A)-(B) (emphasis added).

Enter the HSA, which provides that the Deputy Secretary "shall be the Secretary's first assistant *for purposes* of" the FVRA, expressly incorporating the "first assistant" language used in the FVRA. Pub. L. No. 107-296, § 103, 116 Stat. 2135, 2144 (2002) (emphasis added) (codified at 6 U.S.C. § 113(a)(1)(A)).

On December 15, 2016, former DHS Secretary Jeh Johnson issued DHS Delegation No. 00106 ("Delegation 00106"), DHS Orders of Succession and Delegations of Authorities for Named Positions, Revision 8 ("Revision 8"). Dkt. No. 75-1, Declaration of Bradley Craigmyle ("Craigmyle Decl."), ¶ 6, Ex. 8. Section II.A of Revision 8 states that "[i]n the case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753 ["E.O. 13753"], amended on December 9, 2016." Revision 8 at 1. Under E.O. 13753, the order of succession was: Deputy Secretary; Under Secretary for Management; Administrator of the Federal Emergency Management Agency ("FEMA"); and Director of Cybersecurity and Infrastructure Security Agency ("CISA").[8] Revision 8, Section II.B. states "I hereby delegate to the officials occupying the identified positions in the order listed (Annex A), my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unavailable to act during a disaster or catastrophic emergency." (*Id.*) The first four officials listed in Annex A are the same four officials listed in E.O. 13753.

---

[8] E.O. 13753 actually states that the Under Secretary for National Protection and Programs is fourth in the line of succession. "[T]hat agency has been re-designated as the Cybersecurity and Infrastructure Security Agency," and the Under Secretary for NPP is the Director of CISA. *Casa de Maryland*, 2020 WL 5500165, at *21 n.15; *see also* 6 U.S.C. § 652(a)(1)-(2).

On December 23, 2016, Congress amended the HSA to provide that the Under Secretary of Management "shall be first assistant to the Deputy Secretary … *for purposes of*" the FVRA. Pub. L. No. 114-328, § 1903, 130 Stat. 2000, 2672 (2016) (codified at 6 U.S.C. § 113(a)(1)(F) (emphasis added). Congress also added subsection (g), entitled "Vacancies." *Id.* (codified at 6 U.S.C. § 113(g)). Section 113(g)(1) provides that "[n]otwithstanding [the FVRA], "the Under Secretary of Management shall serve as the Acting Secretary if by reason of … vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary." Section 113(g)(2) provides that "[n]otwithstanding [the FVRA], the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."

On April 9, 2019, Secretary Nielsen signed a memorandum entitled "Designation of an Order of Succession for the Secretary." Craigmyle Decl., ¶ 3, Ex. 2. The Court refers that memorandum and its attachment as the "April 9 Order." It is undisputed that the first time a DHS Secretary purported to alter the order of succession, pursuant to the authority granted in Section 113(g)(2), was when Secretary Nielsen issued the April 9 Order. The memorandum notes that Secretary Nielsen had expressed her "desire to designate certain officers of the Department of Homeland Security … in order of succession to serve as Acting Secretary" and states "[y]our approval of the attached document will accomplish such designation." April 9 Order at 1. It also refers to the attachment as "Annex A." The discussion section of the memorandum is redacted but concludes with the statement that "[b]y approving the attached document, you will designate your desired order of succession for the Secretary of Homeland Security in accordance with your authority pursuant to" 6 U.S.C. section 113(g)(2). *Id.* The attachment states:

> **Amending the Order of Succession in the Department of Homeland Security.**
>
> By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows:
>
> Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby

amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof:

Annex A: Order for Delegation of Authority by the Secretary of the Department of Homeland Security.

1. Deputy Secretary of Homeland Security.

2. Under Secretary for Management;

3. Commissioner of [CPB].

4. Administrator of [FEMA].

…

No individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation.

*Id.* at 2.

The April 9 Order thus amended the officials listed in Annex A by inserting the CBP Commissioner above the FEMA Administrator. On April 10, 2019, DHS updated Delegation 00106 with Revision 08.5 ("Revision 8.5"). That revision provides, in relevant part:

II. Succession Order/Delegation.

A. In the case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016.

B. I hereby delegate to the officials occupying the identified positions in the order listed (Annex A) my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unable to act during a disaster or catastrophic emergency.

Craigmyle Decl., ¶ 5, Ex. 4. Thus, the text of Section II.A in Revision 8.5 remained identical to the text of Section II.A in Revision 8.

As of the effective date of Secretary Nielsen's resignation, the offices of the Deputy Secretary and the Under Secretary of Management were vacant, and Mr. McAleenan was serving in the Senate-confirmed role of CPB Commissioner. Mr. McAleenan assumed the title of DHS Acting Secretary, and when DHS notified Congress of the vacancy left by Secretary Nielsen's

United States District Court
Northern District of California

resignation, it advised he had done so pursuant to 6 U.S.C. section 113(g)(2). Dkt. No. 75-3, Plaintiffs' Notice and Request to Submit Supplemental Briefing, Ex. 3 at 2.

Mr. McAleenan putatively served as Acting Secretary from April 10, 2019, until November 13, 2019, when he resigned. On or about November 8, 2019, Mr. McAleenan issued an order that explicitly amended Section II.A of Delegation 00106 to provide that "In the case of the Secretary's death, resignation, or inability to perform the functions of the Office, the order of succession of officials is governed by Annex A." He also amended the order of officials listed in Annex A to insert the Under Secretary for Strategy, Policy, and Plans above the FEMA Administrator. That amendment also includes the proviso that "[n]o individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation." Craigmyle Decl., ¶ 8, Ex. 7. Mr. Wolf was the Senate-confirmed Secretary for Strategy, Policy and Plans and, thus, purported to assume the role of Acting Secretary of DHS. At the time Mr. Wolf assumed the role of Acting Secretary of DHS, the office had been without a Senate-confirmed Secretary for 217 days.

**1.      Plaintiffs Have Met Their Burden to Show They Are Likely to Succeed on their Claim that Mr. McAleenan and Mr. Wolf Were Not Lawfully Serving Under the HSA.**

The parties agree that under Section 113(g)(2), Secretary Nielsen had the authority to designate an order of succession in the event of her resignation and that she could supersede the provisions of E.O. 13753. They dispute whether Secretary Nielsen's "desire" to change the order of succession was realized. According to Plaintiffs, the language of Revision 8.5 controls and Section II.A of that document demonstrates that E.O. 13753 still governed the order of succession in the event of the Secretary's resignation. Pursuant to that order of succession, Mr. McAleenan was seventh in line and, thus, was not eligible to assume the role of Acting Secretary. Defendants argue the language of the April 9 Order controls and, pursuant to that order, Mr. McAleenan's appointment was valid. Defendants conceded at the hearing that if this Court rejects their arguments on this issue, which it does, the Final Rule would have been promulgated without lawful authority.

Defendants arguments have been considered and rejected by two district courts and by the

12

Government Accountability Office ("GAO"). *See Casa de Maryland*, 2020 WL 5500165, at \*20-\*23; *La Clinica de la Raza v. Trump*, No. 19-cv-04980-PJH, -- F. Supp. 3d --, 2020 WL 4569462, at \*13 (N.D. Cal. Aug. 7, 2020); Dkt. No. 27-1, Declaration of Bryan Stretch ("Stretch Decl."), ¶ 1, Ex. 1 (U.S. Government Accountability Office Decision in the matter of *Department of Homeland Security – Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, File No. B-331650 (Aug. 14, 2020) at 8-9 ("GAO Decision")).

In *La Clinica de la Raza,* the plaintiffs challenged DHS' "public charge" rule and argued that the rule was invalid because Mr. McAleenan had not been validly appointed under the HSA and because his appointment violated the FVRA. 2020 WL 4569462, at \*13. The court, reviewing the plain language of the April 9 Order, determined that it "only replaced Annex A and made no other changes to Delegation No. 00106. Thus, when Secretary Nielsen resigned," E.O. 13753 governed the succession of officials in the event of vacancy and Annex A "applied when the Secretary was unavailable due to disaster or emergency." *Id.* The court also reasoned that if Secretary Nielsen had intended to modify the order of succession in the event of a vacancy, she "could have so stated" as Mr. McAleenan did when he amended Delegation 00106. *Id.*, 2020 WL 4569462, at \*14.[9]

In *Casa de Maryland,* the court also determined that Revision 8.5 meant what it said: E.O. 13753 would govern the order of succession in the event of a vacancy due to resignation and concluded the defendants provided no basis to ignore its plain language. 2020 WL 5500165, at \*20. The court also rejected the defendants' arguments that the references to the order of succession and the authority provided under Section 113(g)(2) demonstrated that Secretary

_____

[9]     The court nonetheless granted the defendants motion to dismiss because "Plaintiffs do not allege that McAleenan failed to meet one of the three options provided by the FVRA for the temporary appointment of officers." *La Clinica de la Raza*, 2020 WL 4569462, at \*14. The court concluded that Mr. McAleenan's appointment may have been valid under the FVRA. *Id.* The court recently granted leave to file a motion to reconsider that decision based on plaintiffs' assertion that defendants have taken the position in other cases, notably *Casa de Maryland,* that Mr. McAleenan was not appointed pursuant to the FVRA. *La Clinica de la Raza v. Trump*, N.D. Cal. No. 19-cv-4980-PJH, Dkt. No. 182 (Order Granting Motion for Leave to File), Dkt. No. 183 (Motion to Reconsider at 3:5-4:2).)

13

Nielsen altered the line of succession in the event of a vacancy. The court determined that language "at best state[d] the obvious – that Nielsen had the authority to change the succession order as applied to the office of the Secretary," but it did not support the proposition that she did so. *Id.*, 2020 WL 55001665, at *22.[10]

Because Mr. McAleenan was not the next in line under E.O. 13753, the court could not "help but conclude" he assumed "the role of Acting Secretary without lawful authority." *Id.*, 2020 WL 5500165, at *21. The court also noted the difference between Mr. McAleenan's amendment to Delegation 00106, which expressly amended Section II.A, and Secretary Nielsen's amendments, which did not. *Id.* The court determined that because Mr. McAleenan had not been lawfully appointed, his amendments to the order of succession were done without authority, impacting Mr. Wolf's subsequent appointment to the role of Acting Secretary and making it likely that the rules at issue would be invalidated under the APA. *Id.*, 2020 WL 55001665, at *21.

Defendants also argue that the additional sentence at the conclusion of the April 9 Order is reflective of language used when establishing orders of succession. Defendants also argue their position is supported by a distinction between a delegation of authority and an order of succession, a distinction that is reflected in the HSA. Under the HSA, the Secretary has the authority to delegate his or her authority to "any officer, employee, or organizational unit of the Department" *and* to designate a further order of succession. *Compare* 6 U.S.C. § 112(b)(1) *with* 6 U.S.C. § 113(g)(2). While that argument has surface appeal, Secretary Nielsen purported to strike the text of Annex A in its entirety. The replacement text continues to state "Annex A. Order for Delegation of Authority…." April 9 Order at 2. Defendants also do not provide a persuasive argument as to why it was necessary for Mr. McAleenan to amend Section II.A of Delegation 00106, if Secretary Nielsen had already accomplished that change. The Court finds the reasoning

---

[10]    The court also noted that defendants failed to cite any authority for the proposition that Delegation 00106 is merely an administrative document as an explanation for why the April 9 Order controls. Here, Defendants do provide a declaration from Neal J. Swartz, submitted in connection with a different case, that provides factual support for that argument. Craigmyle Decl., ¶ 5, Ex. 4. They also cite to *Vill. of Bald Head Island v. U.S. Army Corps. Of Eng'rs*, which noted that in the context of the APA, project implementation is not "final agency action" under the APA. 714 F.3d 186, 195 (4th Cir. 2013). The Court does not find that authority persuasive in this context.

United States District Court
Northern District of California

United States District Court
Northern District of California

set forth in *La Clinica de la Raza* and *Casa de Maryland* on the succession issue highly persuasive, and like the *Casa de Maryland* court concludes that Plaintiffs are likely to show that the appointments were not lawful and, thus, that the Final Rule is likely invalid under the APA.

On September 10, 2020, President Trump formally nominated Mr. Wolf to serve as DHS Secretary. On that same day, Peter T. Gaynor, who became the acting FEMA Administrator in 2019 and was officially confirmed by the Senate in January 2020, "out of an abundance of caution and to minimize any disruption occasioned" by the GAO Opinion, issued a document entitled "Order Designating the Order of Succession for the Secretary of Homeland Security," which mirrored the order Mr. McAleenan issued in November 2019. Craigmyle Decl., ¶ 2, Ex. 1 ("Gaynor order"). Administrator Gaynor states that he exercised this authority pursuant to the FVRA and the order of succession set forth in E.O. 13753, "[a]s the most senior successor listed" in E.O. 13753, "in accordance with the President's advance exercise of his authority *to name an Acting Secretary under the FVRA*." *Id.* (emphasis added). Administrator Gaynor also stated that "[u]pon my signature, any authority that I may have been granted by the FVRA will terminate because 6 U.S.C. § 113(g)(2) applies notwithstanding chapter 33 of title 5." *Id.* (internal quotations omitted). There is nothing in the record that demonstrates whether Administrator Gaynor issued this order before or after President Trump sent Mr. Wolf's nomination to the Senate.

On September 17, 2020, after briefing on the motion had closed, Mr. Wolf issued a document entitled "Ratification of Actions Taken by the Acting Secretary of Homeland Security" (the "Ratification").[11] Dkt. No. 80-1, Declaration of Bradley Craigmyle dated Sept. 18, 2020, ¶ 2, Ex. 1. In the Ratification, Mr. Wolf purports to "affirm[] and ratify[] each of my delegable prior actions as Acting Secretary … out of an abundance of caution[,]" including the Notice of Proposed Rule Making that led to the Final Rule at issue here, as well as the Final Rule. Ratification at 1-2.

Defendants argue that the Ratification nullifies Plaintiffs' first claim for relief because "a subsequent *valid* appointment, coupled with ratification, cures any initial" defects. *Consumer*

---

[11] By adopting this definition, the Court is not expressing its views on the validity of those actions.

*Protection Fin. Bureau v. Gordon*, 819 F.3d 1179, 1190-91 (9th Cir. 2016) (emphasis added). When Mr. Wolf issued the Ratification, his nomination was – and still is – pending confirmation. Defendants also maintain that by virtue of the Gaynor order, Mr. Wolf is not serving pursuant to the FVRA, which would trigger the prohibition on his service under Section 3345(b)(1), even though the Gaynor order suggests that President Trump submitted Mr. Wolf's nomination pursuant to the FVRA. *Sw. General II*, 137 S.Ct. at 935. The effectiveness of the Ratification depends upon a valid appointment. *Consumer Protection Fin. Bureau*, 816 F.3d at 1190-91. For the reasons set forth above, the Court concludes Plaintiffs have shown that they are likely to succeed on the merits of their claim that Mr. Wolf was not validly serving in office. At the very least, Plaintiffs have shown that recent events support a finding that there a serious questions going to the merits of their claim that the Final Rule is contrary to law.

**2.  Plaintiffs Have Not Met Their Burden to Show They Are Likely to Succeed on the Merits of their Claim that Mr. McAleenan's and Mr. Wolf's Appointments Violated the FVRA.**

The FVRA's default rule provides that if a PAS position becomes vacant following a resignation, the "first assistant" would step into the rule and could serve for "no longer than 210 days beginning on the date the vacancy occurs[.]" 5 U.S.C. §§ 3345(a)(1), 3346(a)(1). It is undisputed that when Mr. Wolf assumed the role of Acting Secretary, more than 210 days had elapsed since Secretary Nielsen resigned. The parties' dispute centers primarily on whether the time limits set forth in Section 3346 of the FVRA would apply to individuals serving pursuant to an agency-specific succession statute, such as Section 113(g)(2). Plaintiffs contend that Section 3346's time limits *are* applicable; therefore, Mr. Wolf did not validly hold office. *See also* Dkt. No. 39, Cato Brief at 20 (arguing the "simplest" reason the appointment is invalid is because Mr. Wolf assumed the role after 210 days elapsed following Secretary Nielsen's resignation). "If it were only that simple." *Casa de Maryland*, 2020 WL 5500165, at *15.

In that case, the plaintiffs challenged two sets of rule changes to asylum procedures, including the waiting period to obtain an EAD. The plaintiffs, as Plaintiffs do here, argued the rules were invalid because Mr. Wolf's appointment violated the time limitations set forth in the FVRA. However, the court determined that Congress "tied the timing provision of Section 3346

16

only to offices filled under section 3345, and no others." *Casa de Maryland*, 2020 WL 5500165, at *16. The court relied on the plain language of the FVRA, including Congress's precise use of internal cross-references. *Id.*, 2020 WL 5500165, at *15 (citing *Sw. General I*, 796 F.3d at 74); *see also Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 559 (9th Cir. 2016) ("'Throughout the FVRA, the Congress was precise in its use of internal cross-references,' using the term 'subsection' or 'paragraph' when it meant to refer to something less than a whole section.") (quoting *Sw. General, I*, 796 F.3d at 74).

In particular, the *Casa de Maryland* court noted that Section 3346 did not contain a cross-reference to Section 3347; it provided only that a "person serving as an acting officer as described under section 3345" could serve for no longer than 210 days. *Id.* The court also reasoned that "Congress took great pains to identify 'Sections 3345 and 3346' as the 'exclusive means for temporarily authorizing an acting official" to serve as an acting officer unless an agency specific statute existed. *Id.*, 2020 WL 5500165, at *16. The court then noted that when Mr. Wolf assumed the role of Acting Secretary he was not a "first assistant" and had not been "tapped by the President" and, thus, was not serving pursuant to Section 3345. *Id.*, 2020 WL 5500165, at *18. Because the court construed Section 3346 to be tied to Section 3345, the court could "not find that Wolf's tenure contravene[d] the FVRA, despite his serving well past the FRVA's 210 day time frame." *Id.*

Plaintiffs argue the *Casa de Maryland* court's interpretation of Sections 3346 and 3347 is flawed. They argue that Section 3346 by its terms applies to "a person serving as an acting officer as described under section 3345" and posit that "Section 3345 describes officers 'serving temporarily due to death, resignation, or unavailability[.]'" Reply Br. at 5 n.10. In Plaintiffs' view, these are general descriptors that could also refer to officers serving under an agency-specific succession statute, such as Section 113(g)(2). The Court does not find this argument persuasive. The preamble of Section 3345 refers to those conditions as circumstances that may trigger the appointments, but the body Section 3345(a) describes the categories of individuals who may be tapped to fill a vacancy.

In addition, the only cross-reference to Section 3347 in Section 3345, is in subsection

17

(c)(2), which states that "[f]or purposes of this section and sections 3346, 3347, 3348, 3349, 3349a, and 3349d, the expiration of a term of office is an inability to perform the functions and duties of such office."  The Court does not find the *Casa de Maryland* court's construction of Sections 3346 and 3347 flawed.  If Congress had intended Section 3346 to apply to individuals "serving as an acting officer as described under" either section 3345 or under Section 3347, "it likely would have said" so.  *Id.*  That conclusion is supported further by the fact that many agency-specific statutes incorporate their own time limits on temporary service.  *See Casa de Maryland*, 2020 WL 5500165, at *18 & n.12.

Plaintiffs also focus on the fact that Section 113(g)(2) of the HSA states that the Secretary may designate a further order of succession "notwithstanding" the FVRA, which is in contrast to the phrase "for purposes of" used in Section 113(a)(1)(A) and 113(a)(1)(F) of the HSA.  The latter phrase implies limitation, where as "notwithstanding" generally means "in spite of" or "without prevention or obstruction from or by" and, in the context of statutory construction "shows which provision prevails in the event of a clash."  *Sw. General II*, 137 S.Ct. at 939 (citations omitted); *Hooks*, 816 F.3d at 559 & n. 10; *Sw. General I*, 796 F.3d at 75.  All parties agree with that general proposition.  Plaintiffs argue the phrase "notwithstanding" in Section 113(g)(2) of the HSA is followed by "chapter 33 of Title 5[.]"  Plaintiffs argue that this refers to all, not a portion of, of the FVRA, and they contend there is no conflict between permitting the Secretary to designate a further order of succession and placing the FVRA's time limits on that appointment.  The Court concludes that a more natural read the notwithstanding clause in Sections 113(g)(1) and (g)(2) is that it serves to demonstrate these sections operate as an agency-specific succession statute, superseding the FVRA as the exclusive means to fill a vacancy in the office of DHS Secretary. *Cf.* S. Rep. 105-250, at 15 (1998) (referencing Section 3347 and stating that "statutes enacted in the future purporting to or argued to be construed to govern the temporary filling of offices covered by this statute are not to be effective unless they expressly provide that they are superseding the Vacancies Reform Act").

Plaintiffs also argue that the Court should not follow the reasoning set forth in *Casa de Maryland* because that court failed to consider whether its ruling that Mr. Wolf's appointment

18

under the HSA was invalid also rendered his appointment invalid under the FVRA. Section 3347 states that "Sections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a PSA office, unless an agency-specific statute authorizes designation. 5 U.S.C. § 3347(a)(1)(A). There is no language in Section 3347 that suggests the exclusivity of the FVRA applies only when an official is *properly* designated pursuant to an agency specific statute.

The Court also finds Plaintiffs' reliance on *Hooks* unpersuasive. There, the Ninth Circuit examined the validity of the appointment of the NLRB's general counsel, noting it was undisputed that the appointment did not satisfy the conditions of the NRLA's succession statute. 816 F.3d at 855. The court then rejected the plaintiff's argument that the NLRA's succession statute was the exclusive means to appoint an acting general counsel. 816 F.3d at 556. The D.C. Circuit and the Supreme Court considered that same appointment in the *Southwest General* cases. The D.C. Circuit, on which the *Hooks* court relied, expressly stated "[t]he President *cited the FVRA* as the authority for [the] appointment." *Sw. General I*, 796 F.3d at 71 (emphasis added); *see also Sw. General II*, 137 S.Ct. at 937. Therefore, it is not clear that that the *Hooks* court was called upon to decide how to evaluate the applicability of FVRA where an official has purportedly, but not properly, been appointed pursuant to an agency specific statute. *Cf. Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *United States v. Pepe*, 895 F.3d 679, 688 (9th Cir. 2018) ("cases are not precedential for propositions not considered").

The *Casa de Maryland* court recognized the "tension of crediting an agency succession statute as one that provides 'temporary' service that can continue indefinitely." 2020 WL 5500165, at *18. Plaintiffs argue the Court should not adopt the court's reasoning as to why that tension did not warrant ruling in the plaintiffs' favor. The Court will not repeat that reasoning here, but it does find it persuasive, especially the court's discussion of why, in the context of the HSA, Congress would have wanted to "instill continuity in the functioning of the agency" in a situation where the three top positions at DHS remained vacant. *Id.*, 2020 WL 5500165, at *18-

20.  Accordingly, the Court concludes Plaintiffs have not met their burden to show they are likely to succeed on the merits of their claim that Mr. McAleenan's and Mr. Wolf's appointments violated the provisions of the FVRA.

**C.      Plaintiffs Have Met Their Burden to Show the Final Rule Violates Some Procedural and Substantive Requirements of the APA.**

In addition to allowing a court to set aside agency action that is contrary to law, a court may "hold unlawful and set aside agency action, findings and conclusions found to be - arbitrary, capricious" or "without observance of procedure required by law[.]"  5 U.S.C. §§ 706(2)(A), (D). Plaintiffs raise numerous arguments about why the Final Rule violates procedural and substantive requirements of the APA.  The Court concludes they have met their burden to show a likelihood of success on the merits or, in the alternative, serious questions as to a subset of those arguments. The Court expresses no opinion on the arguments it does not reach.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1989) (internal quotations omitted) ("*State Farm*"). "[T]he notice required by the APA, or information subsequently supplied to the public, must disclose the thinking that has animated the form of a proposed rule and the data upon which that rule is based."  *California ex rel Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1173 (N.D. Cal. 2019) (quoting *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35 (D.C. Cir. 1977)).

A rule may be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.

//

//

20

United States District Court
Northern District of California

**1.   Failing to Disclose Data, Relying on Unexplained Data, and Ignoring Data in the Record.**

Plaintiffs argue that there are procedural flaws in the promulgation of the Final Rule because Defendants failed to "disclose adequate information about the thinking and data on which" the Final Rule is based, in particular the "dramatic change in [USCIS's] financial condition or its skyrocketing costs." Reply Br. at 7:8-9. DHS did disclose the "thinking" that animated the fee changes, namely that "[i]f USCIS continues to operate at current fee levels" it would experience a deficit of $1,262.3 million, revised to $1,035.9 million in the Final Rule. NPRM, 84 Fed. Reg. at 62,282; Final Rule, 85 Fed. Reg. at 46,794 & Table 2; *see also* May IEFA Fee Review at 5.

In some instances, if "an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004) (internal quotations and citations omitted). Defendants argue the NPRM and the Final Rule clearly explain DHS's decision, but even if they are less than ideal, argue the path DHS followed can "reasonably be discerned." For support, Defendants cite a section of the NPRM entitled "Full Cost Recovery." NPRM, 84 Fed. Reg. at 62,283-284. As in other portions of the NPRM and the Final Rule, DHS states that it may "charge fees at a level that will ensure recovery of all direct and indirect costs associated with providing immigration adjudication and naturalization services." *See, e.g.,* NPRM, 84 Fed. Reg. at 62,283; Final Rule, 85 Fed. Reg. at 46,796. That section provides some information about the types of costs DHS can recover through fees. It also states that DHS uses an Activity-Based Costing ("ABC") model, "distribute[s] costs that are not attributed to, or driven by, specific adjudication and naturalization, services," and "make[s] additional adjustments to effectuate specific policy objectives." NPRM, 84 Fed. Reg. at 62,284. While this might provide a general roadmap, nothing in that discussion provides data showing *why* USCIS' fiscal situation has become so dire.

Plaintiffs also acknowledge that DHS described four general categories of costs that would

21

comprise part of UCSIS' budget. NPRM, 84 Fed. Reg. at 62,286 (citing transfer of funding to ICE, pay and benefit adjustments for on-board staff, pay and benefits for new staff, and net additional costs). Plaintiffs argue that taking those estimates into account, the bulk of the budget remains unexplained. *See, e.g.,* Dkt. No. 27-8, Declaration of Douglas B. Rand ("Rand Decl."), ¶¶ 24-25. Defendants have not countered that point with argument or data. Plaintiffs also contend that there is insufficient data in the record to understand how the model actually works and cite to some results that appear inconsistent with that model. *Id.*, ¶¶ 30-34.

In support of their argument that the calculations and data underlying the rule are adequate and that Plaintiffs have not overcome the deference owed to DHS' expertise, Defendants cite to *Consumer Electronics Association v. Federal Communications Commission*, 347 F.3d 291 (D.C. Cir. 2003). There, the plaintiffs challenged a final rule that required certain televisions and other devices capable of receiving over-the-air television signals to include a tuner that could receive digital signals ("DTV"). The plaintiffs argued the FCC unreasonably assessed the costs of this change to consumers. *Id.* at 293-94, 302. The court rejected that argument noting that although the FCC's assessment was not a "model of thorough consideration" it met the minimum requirements for reasoned decision making. *Id.* at 302. The court reasoned that the FCC had been gathering information about economies of scale for as long as it had been managing the DTV transition and, during the rule making process, asked for comments on the initial projected costs of the requirements of costs over time. *Id.* The comments submitted provided wide ranging estimates, especially on the question of whether costs would decrease over time. The court acknowledged the evidence before the FCC was "imperfect and uncertain" but determined it was not unreasonable to assume that costs would fall. Therefore, it deferred to the FCC's "predictive judgment" and upheld the agency's determination that those costs were not outweighed by the benefits of the proposed rule. *Id.*

According to Defendants, "DHS saw no or limited decreases in the number of benefit requests after its fee adjustments in 2007, 2010, and 2016." They argue those references provide the data that justified changes to the rule. *See, e.g.,* Final Rule, 85 Fed. Reg. at 46,798, 46,805, 46,860, 46,881, 46,882, 46,886. DHS also stated that it "is unable to quantify how many people

22

United States District Court
Northern District of California

will not apply [for immigration benefits] because they do not have access to fee waivers," and stated it "does not know the price elasticity of demand for immigration benefits, nor does DHS know the level at which the fee increases become too high for applicants/petitioners to apply." *Id.* at 46,797. DHS then stated it "disagreed that the fees will result in the negative effects the commenters' suggested" because it "believes that immigration to the United States remains attractive … and that its benefits continue to outweigh the costs noted by the commenters." *Id.* DHS concludes that it "believes the price elasticity for immigration services is inelastic and increases in price will have no impact on the demand for these services. This is true for all immigration services impacted by this rule." *Id.*

Unlike the FCC in *Consumer Electronics*, it is not immediately evident that DHS has been gathering data over the years about the impact of price increases on applications for immigration benefits. In addition, these statements appear to ignore information presented during the notice and comment period that contradict DHS' beliefs about price elasticity of demand. *See, e.g.,* Stretch Decl., ¶ 7, Ex. 6 (Comment Letter dated Dec. 30, 2019 from Naturalization Working Group at 6 (citing Pastor, *et al.*, National Partnership for New Americans, "Nurturing Naturalization: could Lowering the Fee Help?" 17 (Feb. 2013)); Stretch Decl., ¶ 23, Ex. 22 (Comment Letter dated Dec. 30, 2019 from National Immigration Law Center (NILC), Ex. A, Comment Letter dated Nov. 27, 2018 at 5 n.4, citing Hainmueller*, et al.*, *A randomized controlled design reveals barriers to citizenship for low-income immigrants*, at 1 (Jan. 30, 2018); *see also* Dkt. No. 27-11, Declaration of Manuel Pastor, Jr., ¶ 17. Those facts support the conclusion that Plaintiffs would be likely to succeed on the merits of their APA claim. *See State Farm*, 463 U.S. at 43 (rule may be arbitrary and capricious where explanation for decision runs counter to evidence in the record).

**2.    Failure to Consider Important Aspects of the Problem.**

The Defendants' belief about the price elasticity of demand for immigration services leads to another of Plaintiffs' larger arguments about why the Final Rule is arbitrary and capricious: the failure to consider important aspects of the problem, including the negative impact the rule will have on low-income immigrant populations. Plaintiffs note that Defendants' reliance on statistics

23

or data following prior fee increases is not a fair comparison because the Final Rule combines increases with a correspondent decrease in the ability to obtain waivers of fees, a variable not relevant to past fee changes. The Court agrees with that assessment.

In addition, at the hearing on this motion, Defendants conceded they did not take the changes to the waiting period for an applicant for asylum to obtain an EAD into consideration when promulgating the changes to the fees for immigration benefits. *See also* Final Rule, 85 Fed. Reg. at 46,852 (noting that "[n]o asylum seeker may receive employment authorization before 180 days have passed since the filing of his or her application" and concluding that "charging asylum seekers for the first work permit [would not create] a conflict between contradictory conditions where aliens cannot work to pay their asylum fees and may incentivize people to work illegally").

Defendants argue that DHS uses data available to it at the time of review and argue that by the time the rule relating to the waiting period was issued, the Final Rule here was in the final clearance process. However, this is not a situation where a rule promulgated by a *different* agency could impact a rule being proposed by DHS. Rather, these were two rules proposed by the same agency, at the same time, on overlapping topics. Further, DHS published the Final Rule in this case on August 3, 2020. The final rule that impacted the waiting period had been published in June. Thus, DHS' reference in the Final Rule to a 180-day waiting period was, by that time, demonstrably inaccurate. By failing to consider the combined impact of these rules, DHS either failed to consider an important aspect of the problem and disregarded "inconvenient facts" about the combined impact of these rules, *Fox,* 556 U.S. at 537, or DHS reached a conclusion that defies common sense, *cf. Casa de Maryland,* 2020 WL 5500165, at *28 ("It is axiomatic that without being able to work, asylum applicants lack the resources to pursue their claims."). Either situation lends further support to the conclusion that Plaintiffs would be likely to succeed on the merits of this aspect of their challenge to the Final Rule or, in the alternative, that they have shown serious questions going to the merits of that aspect of their APA claims.

### 3.    Failure to Justify Policy Shifts.

Plaintiffs also argue Defendants failed to adequately justify the shift in policy from the ability-to-pay principle to the beneficiary-pays principle utilized in the Final Rule or to adequately

United States District Court
Northern District of California

United States District Court
Northern District of California

justify the significant departure from past practice with regard to asylum fees.  "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, __ U.S. __, 136 S.Ct. 2117, 2125 (2016).

> An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. …  And of course the agency must show that there are good reasons for the new policy.  But it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates.  This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.  Sometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. … It would be arbitrary or capricious to ignore such matters.  In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

*FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515-16 (2009) ("*Fox*"); *see also Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Fox,* 556 U.S. at 515-16).

The record establishes that DHS was aware and acknowledged that it was shifting from the ability-to-pay principle to the beneficiary-pays principle.  *See* Final Rule 85 Fed. Reg. at 46,799 ("[I]n this final rule DHS is emphasizing the beneficiary-pays principle of user fees."), 46,806-07 (acknowledging "change from its previous approach" and stating "[i]n prior years, USCIS fees have given significant weight to the ability-to-pay principle[.]")  DHS also noted that shift in policy as it related to naturalization fees, stating:

> [t]he fee for [Form N-400] is increasing more than for most other forms because DHS has historically held the fee … below the estimated cost to USCIS of adjudicating the form in recognition of the social value of citizenship.  Immigration services provide varying levels of social benefit and previously DHS accounted for some aspect of the social benefit of specific services through holding fees below their cost.  However, in this final rule DHS is emphasizing the beneficiary-pays principle of user fees.

Final Rule, 85 Fed. Reg. at 46,799.  DHS also acknowledged the fact that the decision to impose a

fee to apply for asylum was a change in policy. Therefore, DHS was aware that it was changing positions. That "conscious change of course adequately indicates" an agency's belief that a new policy is better. *Fox,* 556 U.S. at 515. DHS's belief that the beneficiary-pays principle is a better policy also is reflected in its statements that it believes the policy is more "equitable." *See, e.g.,* Final Rule, 85 Fed. Reg. at 46,806 ("DHS … believes these changes will make USCIS' fee schedule more equitable for all immigration benefits by requiring fees to be paid mostly by those who receive and benefit from the applicable service."), 46,819 (same), 46,890 (same).

However, at least five Plaintiffs attest that they have structured their service models based on the ability-to-pay principle, engendering reliance interests in its continued application. *See, e.g.,* Benito Decl. (ICRR), ¶¶ 29-30; Byrne Decl. (IRC), ¶ 34; Byun Decl. (ACRS), ¶¶ 15, 25; Chenoweth Decl. (CLINIC), ¶¶ 23, 33, 37; Rodgers Decl. (ILRC), ¶¶ 19-25. Defendants argue that "at most" they were only required to consider applicant's interests, rather than any reliance interests Plaintiffs might have, because Plaintiffs are outside the relevant zone of interests served by Section 1356(m). The Court is not persuaded.

First, *Fox* does not limit its discussion of reliance interests to interests that are "directly affected" by proposed action; it requires a more detailed justification when a prior policy has "engendered serious reliance interests that must be taken into account." *Fox,* 556 U.S. at 515. Second, despite multiple rounds of briefing on various issues and oral argument, Defendants have not argued that Plaintiffs lack standing to sue. The zone of interests test cited by Defendants "is not meant to be especially demanding;" it will deny a plaintiff a right of review where those interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). The record shows Plaintiffs directly or indirectly provide services to individuals who will be impacted by the changes in the fee schedule and the fee waiver policy, making Plaintiffs interests more than "marginally related" to statutory and regulatory provisions governing those issue.

For that reason, and for the reasons discussed in Section D, *infra*, regarding irreparable harm, Plaintiffs' reliance interests cannot be discounted, even if Defendants may not be required to

United States District Court
Northern District of California

align the fees with those interests. *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, __ U.S. __, 140 S.Ct. 1891, 1914 (2020) (noting that reliance interests of individuals indirectly impacted by DACA program were "noteworthy" but not necessarily "dispositive" concerns and stating "DHS may determine … that other interests and policy concerns outweigh any reliance interests," but DHS failed to make that "difficult decision" by ignoring reliance interests").

Even if Plaintiffs' reliance interests are not pertinent to this inquiry, DHS was not writing on a "blank slate" with regard to fee increases, the changes to fee waivers, and the asylum fee. Therefore, the Court concludes that "a more detailed justification" for policy changes that contradict prior findings or had engendered reliance interests is required. *Fox*, 556 U.S. at 515-16. For example, Defendants do not provide a persuasive explanation of why it is more likely that those with legitimate claims for asylum are more likely to have $50 than those who do not; nor do they supply data to support that proposition. DHS also acknowledged there is no quantitative benefit from the fee. *See* Final Rule, 85 Fed. Reg. at 46,894.

With respect to the fees associated with naturalization, Plaintiffs also argue that the shift in policy conflicts with congressional intent. Plaintiffs cite to an appropriations bill that stated "USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee. USCIS is also encouraged to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver." DHS Appropriations Bill, 2019 H.R. Rep. No. 115-948, at 61-62 (Sept. 12, 2018).

In large part, DHS responded to such concerns by reference to the arguments about price elasticity of demand and its belief that the change is necessary to fully recover costs of adjudication. For the reasons discussed above, that explanation is not supported by adequate data. The Court also finds, at this stage, that Defendants' deviations from a beneficiary-pays principle are inconsistent and conflict with the comments presented on the effects of these changes on low-income and vulnerable immigrant populations. *See, e.g.,* Final Rule, 85 Fed. Reg. at 46,841 (deviating from the beneficiary-pays principle on Form I-360, because would "place unreasonable burden" on religious organizations petitioning for their workers); Final Rule, 85 Fed. Reg. at

27

46,850 and NPRM, 84 Fed. Reg. at 62,313 (deviating from beneficiary-pays principle regarding foreign adoptions because "it would be contrary to humanitarian and public interests to impose" full fee "on prospective adoptive parents seeking to adopt a child from another country").

### 4. Reliance on Factors Congress did not Intend DHS to Consider.

In addition to the issues on the asylum fees discussed above, Plaintiffs argue the decision to impose the asylum related fees is arbitrary and capricious because Defendants stated during the NPRM that the fee was intended to deter frivolous applications. NPRM, 84 Fed. Reg. at 62,320; *see also* Stretch Reply Decl., ¶ 7 Ex. 40 (Regulatory Impact Analysis ("RIA"), July 22, 2020 at 150 ("DHS set the fee so that it would not require an alien an unreasonable amount of time to save, may generate some revenue to offset costs, and may deter some filings.").) Defendants argue that throughout the Final Rule they made clear their intent is to generate some revenue to cover costs and that "DHS does not intend to discourage meritorious asylum claims or unduly burden any applicant, group of applications, or their families." Final Rule, 85 Fed. Reg. at 46,844; *see also. Id.* at 46,850, 46,882. Although the language used in the NRPM and the RIA does not appear in the Final Rule, that purpose can reasonably be inferred from DHS's statement that "it did not intend to discourage *meritorious* asylum claims[.]" Final Rule, 85 Fed. Reg. at 46,844 (emphasis added).

For each of the reasons discussed above, the Court concludes Plaintiffs have demonstrated a likelihood of success on the merits or, in the alternative, have demonstrated serious questions going to the merits their challenges to the Final Rule under the APA.

### D. Plaintiffs Have Met Their Burden to Show Irreparable Harm.

In order to obtain an injunction Plaintiffs must show it is likely – rather than possible – that they will suffer irreparable harm. *Winter*, 555 U.S. at 20. "Organizations may establish irreparable harm by showing 'ongoing harms to their organizational missions.'" *Barr*, 964 F.3d at 854 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). Defendants argue Plaintiffs "rely on economic harm[,]" which is not irreparable. Opp. Br. at 14:21. In the context of APA claims, "controlling circuit precedent establishes otherwise." *Barr*, 964 F.3d at 854; *see also East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020)

28

("*Trump II*").[12]  "[E]conomic harms may be irreparable because plaintiffs are otherwise unable to recover monetary damages." *Barr*, 964 F.3d at 854.

In *Barr*, the plaintiffs presented un-refuted evidence that the rule at issue "harm[ed] their mission of representing and assisting asylum seekers and results in a substantial loss of organizational funding" and jeopardized funding streams. *Id.*  The court reasoned that because the rule rendered "a substantial portion of plaintiffs' clients categorically ineligible for asylum, it directly threatens their standard caseload, and consequently, their caseload dependent funding." *Id.*  The Ninth Circuit, therefore, affirmed the district court's conclusion that the plaintiffs "established a sufficient likelihood of irreparable harm through diversion of resources and the non-speculative loss of substantial funding from other sources." *Id.* (quoting *East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 957 (N.D. Cal. 2019)).  The plaintiffs in *Trump II* also presented evidence that showed they would "suffer a significant change in their programs and a concomitant loss of funding." 950 F.3d at 1280.  The Court held "[b]oth constitute irreparable injuries: the first is an intangible injury; and the second is economic harm for which the [plaintiffs] have no vehicle for recovery." *Id.*

Plaintiffs submitted unrebutted evidence that, as part of their overall missions, they assist low-income immigrants with applications for immigration benefits, including naturalization and asylum.  Benito Decl., ¶¶ 5, 13; Byrne Decl., ¶¶ 3-4, 6, 27; Byun Decl., ¶¶ 3-5, 14; Chenowith Decl., ¶¶ 2-3, 5, 32; Smith Decl., ¶¶ 3-7; Rodgers Decl., ¶¶ 2, 24; Salas Decl., ¶¶ 2, 14; Stolz Decl., ¶¶ 3, 33.  Plaintiffs attest that fee waivers, which from the record are tied to the ability-to-pay principle that was reflected in prior fee changes, are critical to fulfilling their mission.  According to Plaintiffs, the combination of the changes to fee waivers and the fee increases will either increase their own costs or make existing business models unsustainable. *See, e.g.,* Benito Decl., ¶¶ 11, 27, 29-30; Byrne Decl., ¶¶ 27-29, 34; Byun Decl., ¶¶ 15-16, 20, 24-25; Chenowith

---

[12]  Plaintiffs also present evidence that the Final Rule threatens the existence of certain programs and that if they are unable to meet deliverables the good will and reputation they have established with donors will suffer. *See, e.g.,* Byun Decl., ¶ 26, Smith Decl., ¶ 37.  Defendants do not present evidence to refute those assertions, which further support the Court's conclusion that Plaintiffs would suffer irreparable harm in the absence of an injunction. *See, e.g., hiQ Labs., Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019).

Decl., ¶¶ 17, 22-23, 26-27, 33, 36; Smith Decl., ¶¶ 19, 21, 24, 27, 29, 35; Rodgers Decl., ¶¶ 12, 19, 21, 23, 27; Salas Decl., ¶¶ 17, 20, 23; Stolz Decl., ¶¶ 7, 24, 30-31, 33.)  Like the plaintiffs in *Barr* and *Trump II*, each Plaintiff attests that the Final Rule has and will continue to impact their ability to meet funding obligations, has and will continue to cause them to divert existing resources, or that both scenarios have and will continue to occur.  Benito Decl., 13-15, 26, 39-44; Byrne Decl., ¶¶ 14, 30, 35-37, 39; Byun Decl., ¶¶ 6-7, 16, 25-30; Chenowith Decl., ¶¶ 11, 39, 40, 42-43, 46, 48, 54, 56; Smith Decl., ¶¶ 8, 21, 27, 33, 37-42; Rodgers Decl., ¶¶ 5-6, 10, 23-26, 28-32; Salas Decl., ¶¶ 3, 18-20, 23-24, 28; Stolz Decl., ¶¶ 4, 11-15, 28, 30, 34-39.  CHIRLA also attests that its members either will not apply for or will be forced to wait to apply for benefits, impacting family unification.  Salas Decl., ¶¶ 29-31, 34; *cf.* Smith Decl., ¶¶ 32-33 (noting similar harms to population that EBSC serves).  In addition, Plaintiffs filed suit within three weeks after DHS published the Final Rule.  Although "not dispositive", it does suggest "urgency and impending irreparable harm."  *Trump II*, 950 F.3d at 1280.

Defendants did not address the Ninth Circuit's holdings in either *Barr* or *Trump II* in their briefs, and their arguments on the factual record here do not provide a basis for the Court to meaningfully distinguish those cases.  Defendants' arguments at the hearing on the issue of irreparable harm were similarly unpersuasive.  Accordingly, the Court concludes that Plaintiffs have established a likelihood of irreparable harm before the Court reaches a decision on the merits based on their showing of "non-speculative loss of substantial funding from other sources" and their showing of the need to alter their programs.  *See Barr*, 964 F.3d at 1280; *Trump II*, 950 F.3d at 1280.

**E.    Plaintiffs Have Met Their Burden to Show the Balance of Equities and Public Interest Weighs in Favor of an Injunction.**

Because the government is a party, the third and fourth *Winter* factors merge.  *Barr*, 964 F.3d at 854.  "[T]he government and the public have an interest in the efficient administration of the immigration laws at the border. … Control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature."  *Trump II,* 950 F.3d at 1281 (internal quotations, citations and alterations omitted).  Plaintiffs do not suggest those

30

interests would not extend to the efficient administration of applications for immigration benefits. Defendants also argue they do not, as Plaintiffs contend, have a "surplus," and DHS reported only that USCIS would not deplete its carryover balance. Defendants also argue that if the Court enjoins the rule USCIS will forego millions of dollars of revenue each day, which will lead to funding cuts, furloughs, and further delays in processing applications.

The public would have an interest in reducing or relieving burdens on the adjudication of immigration benefits. *Cf. Barr*, 964 F.3d at 855 ("On the side of the government, the public has an interest in relieving burdens on the asylum system and the efficient conduct of foreign affairs."). However, the weight the Court will ascribe to those factors depends, in part, on the validity of the Final Rule. *Trump II*, 950 F.3d at 1282. For the reasons set forth in Sections B and C, the Court has determined Plaintiffs are likely to succeed on the merits on at least some portions of their APA claims that the Final Rule is invalid. For that reason, and for reasons discussed below, the Court places less weight on this factor. *Id.*

Plaintiffs persuasively argue that the public interest would be served by enjoining or staying the effective date of the Final Rule because if it takes effect, it will prevent vulnerable and low-income applicants from applying for immigration benefits, will block access to humanitarian protections, and will expose those populations to further danger. Plaintiffs also cite comments and research that argue the public at large would be harmed if the Final Rule goes into effect because it will negatively impact tax revenues and would delay individuals seeking to naturalize from participating in essential civic activities like voting, service in public office, and jury service. Defendants do not counter those arguments.

Finally, in light of the issues raised regarding the validity of Mr. McAleenan's and Mr. Wolf's appointments, the Court concludes the public has an interest in avoiding overreach of Executive power with respect to appointments that require the informed consent of the Legislative branch. *Cf. Barr,* 964 F.3d at 855 (affirming district court's conclusion that public interest is served by "ensuring that statutes enacted by their representatives are not imperiled by executive fiat," where court found the rule at issue was "contrary to the asylum statute and contravene[d] clear congressional intent to give effect to our international treaty obligations"); *Trump II*, 950

31

F.3d at 1281 ("[T]he public has an interest in ensuring that the "statutes enacted by [their] representatives" are not imperiled by executive fiat.") (quoting *East Bay Sanctuary Covenant v. Trump,* 932 F.3d 742, 779 (9th Cir. 2018) ("*Trump I*"), in turn quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)).

The Court concludes the Plaintiffs have met their burden to show the public interest and the balance of the equities tip sharply in favor of enjoining implementation and staying the effective date of the Final Rule.

**F.     The Scope of the Injunctive Relief.**

Plaintiffs argue the Final Rule should be enjoined or stayed in its entirety.  Defendants argue Plaintiffs would not be "entitled to injunctive relief with respect to any aspect of the rule where they have not substantiated a specific harm[.]"  Opp. Br. at 15:6-17.  Neither party directly addressed the geographic scope of any remedy to be imposed.  The Court "recognizes that the proper scope of injunctions against agency action is a matter of intense and active controversy." *Innovation Law Lab v. Wolf,* 951 F.3d 986, 990 (9th Cir. 2020) (staying portion of decision granting nationwide injunction and limiting injunction to "geographical boundaries of the Ninth Circuit").

The Court has "considerable discretion in crafting suitable equitable relief[.]"  *Trump II*, 950 F.3d at 1282.  Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court."  *Id.* (citation omitted); *accord Barr*, 964 F.3d at 855-56.  An injunction need not, however, "affect only the parties in the suit."  *Bresgal v. Brock*, 843 F.2d 1163, 1169-70 (9th Cir. 1987).  A "broad" injunction may be "appropriate when necessary to remedy a plaintiff's harm."  *Barr,* 964 F.3d at 855.  Plaintiffs have shown the Final Rule interferes with their organizational missions and is likely to cause them to lose funding.  In *Barr,* the court concluded that "[c]omplete relief for plaintiff must remedy both harms," and it determined that the plaintiffs did "not operate in a fashion that permits neat geographic boundaries."  *Id.* at 856 (quoting *Trump II*, 950 F.3d at 1282-83).  The Court concludes the same is true in this case.  The Court also has received amicus briefs from a wide array of local and state governments arguing in favor of setting aside the Final Rule.  The Final Rule also

United States District Court
Northern District of California

32

touches on immigration policy, and "cases implicating immigration policy have a particularly strong claim for uniform, nationwide relief." *Id.* at 857 (internal quotations and citations omitted, and citing cases). The Court concludes the record demonstrates that universal relief is warranted.[13]

The Court is mindful of the fact that the Final Rule contains a severability provision. Final Rule, 85 Fed. Reg. at 46,921 (citing 8 C.F.R. § 106.6). In *Casa de Maryland*, the court cited to a similar severability provision to show why a more limited injunction was appropriate. 2020 WL 5500165, at \*33 (noting severability provision created presumption that DHS "did not intend the validity of the [remaining rules] … to depend on the validity of the … offensive provision"). Because of the number of fees and policies addressed by the Final Rule and taking into consideration the severability provision, the Court directed Plaintiff to submit a statement of the fees that would most impact the populations they serve. *See* Dkt. No. 95. The Court has carefully considered whether it should limit its stay to the forms covered in that list, the imposition of the asylum fee, and the changes to the fee exemptions and waivers.

However, the Court has determined that Plaintiffs are likely to show that Mr. McAleenan's and Mr. Wolf's appointments impact the validity of the Final Rule in its entirety. In addition, many of the flaws identified in its discussion of why Plaintiffs are likely to succeed on the merits of their arguments on the other procedural and substantive violations of the APA also impact fees and forms beyond those identified by Plaintiffs. In the context of the APA, when such findings are made "the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed." *Trump II,* 950 F.3d at 1283 (internal quotations and citations omitted); *accord Barr,* 964 F.3d at 856-57 ("[v]acatur of an agency rule prevents its application to all those who would otherwise be subject to its operation) (citing cases).

Accordingly, the Court concludes it is appropriate to stay the effective date of the Final Rule pending resolution of the merits in this case. *See Washington v. U.S. Dep't of Homeland*

---

13   The *Casa de Maryland* declined to issue a nationwide injunction on the basis that it was bound by a recent Fourth Circuit decision that the plaintiffs did not meaningfully distinguish, *Casa de Maryland v. Trump*, 971 F.3d 220 (4th Cir. 2020). *See Casa de Maryland,* 2020 WL 5500165, at \*32.

United States District Court
Northern District of California

*Sec.,* 408 F. Supp. 3d 1191, 1212-1213, 1223 (E.D. Wash. 2019).

**G.      Security.**

Pursuant to Federal Rule of Civil Procedure 65(c), the Court finds in its discretion that it is not proper to impose any security for the preliminary injunction because (1) despite the assertion that USCIS "would continue to forgo millions of dollars of revenue each day" if the Final Rule is stayed or enjoined, Defendants did not request a bond; and (2) there is a significant public interest at stake.  *See, e.g., East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 868-69 (N.D. Cal. 2018) (citing *Johnson v. Couturier*, 472 F.3d 1067, 1086 (9th Cir. 2009) (finding that the district court retains discretion "as the amount of the security required, if any")).

**H.      The Court Denies the Government's Request for a Brief Administrative Stay.**

In general, a motion to stay pending appeal must be presented to the district court in the first instance.  Fed. R. App. P. 8(a)(1)(A).  Because the Final Rule was scheduled to go into effect a week after the hearing on the motion, the Court posed a question to the parties about their positions on a stay of the ruling pending appeal.  At that time, Defendants' counsel noted that they were not the decision makers on whether to appeal or whether Defendants would seek a stay.  Therefore, they asked that if the Court's ruling was adverse to them, it impose a brief administrative stay to allow that process to occur.  A stay beyond October 2, 2020, would allow the Final Rule to go into effect, thereby altering the status quo.  For that reason, the Court denies Defendants' request for a brief administrative stay.  If Defendants do file an appeal, nothing in this Order shall preclude them from filing a motion to stay before this Court.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction and a stay of the effective date of the Final Rule.  Accordingly,

1.      Pursuant to 5 U.S.C. section 705 the Court STAYS implementation and the effective date of of USCIS Immigration Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788 (Aug. 3, 2020) (the "Final Rule") in its entirety pending final adjudication of this matter.

2.      Pursuant to Federal Rule of Civil Procedure 65, Defendants Wolf, in his official

United States District Court
Northern District of California

34

capacity under the title of Acting Secretary of DHS; Cuccinelli, in his official capacity under the title of Senior Official Performing the Duties of the Deputy Secretary of DHS; DHS; and USCIS, and all persons acting under their direction, ARE ENJOINED from implementing or enforcing the Final Rule or any portion thereof.

3. This preliminary injunction and stay shall take effect immediately and shall remain in effect pending trial in this action or further of this Court.

4. The posting of security is waived.

**IT IS SO ORDERED.**

Dated: September 29, 2020

_____
JEFFREY S. WHITE
United States District Judge

United States District Court
Northern District of California

35